UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CECIL W. WATSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 413 |
| ) | |
| JOHN E. POTTER, Postmaster General ) | Judge Rebecca R. Pallmeyer |
| of the United States, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cecil Watson worked for the United States Postal Service ("USPS") for twenty-two years, ultimately becoming manager of the branch in Hoffman Estates, Illinois. In 2005, a series of incidents at the Hoffman Estates facility culminated in Plaintiff's being stripped of his managerial duties and subsequently terminated. Plaintiff catalogues these incidents in his complaint and alleges that they were motivated by racial discrimination and a desire to retaliate against him for a previous complaint he filed with the Equal Employment Opportunity Commission ("EEOC"). Both Plaintiff and Defendant have moved for summary judgment and, for the reasons that follow, Defendant's motion is granted.

## FACTUAL BACKGROUND

Plaintiff, an African-American male, began working for USPS in 1984. (Def.'s 56.1 ¶ 3.) In 1990, Plaintiff applied for and was denied a management position within USPS. *Watson v. Potter*, No. 96 C 7044, 2002 WL 31006129, at *1 (N.D. Ill. Sept. 5, 2002). Plaintiff claimed that he was denied the promotion because of his race, and an administrative judge with the EEOC agreed and recommended that Plaintiff be offered a management position. *Id.* Plaintiff never received that promotion, however, and after lengthy litigation, in September 2002, Judge Coar of this court ordered that Plaintiff be promoted to an Executive and Administrative Salary ("EAS") Level 21 position and be awarded back pay. *Id.* at *11. The following month, Plaintiff became the manager

of the Hoffman Estates branch of the Schaumburg Post Office. (Def.'s 56.1 ¶ 3.) The Schaumburg Post Office runs two branch offices: Hoffman Estates and Roselle. (*Id.* ¶ 1.) As manager of a branch office, Plaintiff reported directly to the Postmaster of the Schaumburg Post Office, Kenneth Michalowski, who in turn reported to Arthur Bacon, the Manager of Post Office Operations. (*Id.* ¶ 2.)

Watson claims that he and Michalowski had a fine working relationship until December 2004. (*Id.* ¶ 9.) That month, a new supervisor, Jody Marino, began working under Watson's direction. (*Id.* ¶ 10.) When she reported to work two hours early on her first day following a week of training, Watson told her she would not be paid for that time because she had not obtained prior approval from him. (*Id.*) Marino complained to Michalowski about Watson's decision, and Michalowski instructed Watson to pay Marino for the two hours unless he had some reason to know that she did not actually work those hours. (*Id.* ¶¶ 11-12.) Watson disagreed with Michalowski's decision because he believed the relevant issue was that she had not obtained prior approval. Watson therefore continued to refuse to input Marino's two hours; Michalowski ultimately directed another manager to input Marino's hours and issued Watson a letter of warning for insubordination. (*Id.* ¶ 14.) Watson appealed the letter to Bacon and to Terry Green, the Area Manager of Human Resources, but both found the penalty appropriate. (*Id.*)

In January 2005, Michalowski, pursuant to a directive from Bacon, informed Watson and the other managers that they were required to stay at their offices until the last letter carrier returned to the facility. (*Id.* ¶ 15.) On January 26, Watson reported to work at 7:30 a.m. and left at 4:30 p.m., before the last letter carrier returned, due to a personal matter. (Pl.'s 56.1 ¶ 14.) Shortly after Watson left for the day, Michalowski called the Hoffman Estates branch and learned that Watson had left before all of the letter carriers had returned. (Def.'s 56.1 ¶ 16.) Watson had not called Michalowski to inform him that Watson needed to leave early, and Michalowski issued another letter of warning to Watson for failing to follow instructions. (*Id.* ¶¶ 16-17.) The letter was issued in lieu

of a seven-day suspension, and was again upheld as an appropriate response by both Bacon and Green. (*Id.* ¶ 17.)

In April 2005, Michalowski sent an e-mail to the managers instructing them to take over responsibility for maintaining the overtime and annual leave lists for staff under their supervision. He specifically stated, "If you have your supervisors doing this currently, stop." (*Id.* ¶ 18.) On August 26, 2005, Michalowski sent a follow-up e-mail to the managers to ensure that they were complying with his directive. (*Id.* ¶ 19.) Watson replied that he had taken over maintenance of the annual leave list but not the overtime list because he was too busy; Watson urged Michalowski to "consider allowing [a supervisor] at H.E. handle [the overtime list] until things settle down." (*Id.*) Michalowski issued yet another letter of warning to Watson for failure to follow his instructions. (*Id.* ¶ 20.) This letter was in lieu of a fourteen-day suspension, and was again approved by Bacon and affirmed by Green. (*Id.*)

Watson submitted an annual report of his own performance in October 2005. (*Id.* ¶ 21.) Based on numeric goals contained in the report, Watson rated his accomplishments in the "non-contributor" range, the lowest of four rankings, in three of the four "Core" requirements listed on the evaluation. (*Id.* ¶ 21.) Michalowski agreed with Watson's evaluation. (*Id.*) Plaintiff believes that his peer managers were allowed to set their own Core goals for the evaluation form, while his goals were evaluated by Michalowski, but he cites no evidence that his evaluation was administered differently from those of the other managers. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 21.) In an apparent effort to establish that his performance was satisfactory, Watson points out that in December 2004, Michalowski had issued Watson a $1000 cash award for maintaining "a trend of continued positive performance." (*Id.*; Ex. 26 to Pl.'s 56.1.)

At about 3 a.m. on November 30, 2005, one of Watson's employees called him at home and informed him that a suspicious powder had been found at the bottom of an incoming mail container. (Pl.'s 56.1 ¶ 44.) Watson asked her if it appeared to be detergent, but the employee was unsure.

(*Id.* ¶ 45.) Since 2001, when a number of USPS facilities around the country were exposed to anthrax and several postal workers died, USPS had devoted resources to training its employees regarding the proper ways to handle suspicious substances. (Def.'s 56.1 ¶ 22.) Plaintiff has admitted that he was familiar with many of the documents that USPS had published regarding the proper procedure for handling hazardous materials; in fact, Plaintiff has given safety talks to his employees on the subject, and a poster hanging on the wall in the hallway that led to his office contained instructions on how to respond to "suspicious mail and unknown powder or substances," instructing employees: "Don't handle, isolate the substance." (*Id.*; EEOC Tr. 235-237, Ex. C to Def.'s 56.1.) Watson nevertheless directed the employee who had called him to have another mailhandler put on gloves, place a small amount of the powder in a cup, and run water on it to determine if it was detergent. (Pl.'s 56.1 ¶ 45.) The substance did not foam, and the Hoffman Estates Fire and Police Departments, who were summoned to the scene, determined the substance was not toxic.[1] (*Id.* ¶ 47.) Later that day or the next day, Plaintiff described this incident to Michalowski, who advised Plaintiff that the instructions he gave violated USPS procedure. (Pl.'s Resp. to Def.'s 56.1 ¶ 24.) After confirming the details with employees at the Hoffman Estates branch, Michalowski told Plaintiff that, until further notice, he was no longer to direct the Hoffman Estates employees and that he was to report directly to Michalowski at the Schaumburg facility. (Def.'s 56.1 ¶ 25.)

As the record reflects, Watson never again worked regularly for the Postal Service. Over the next two weeks, he showed up only sporadically, complaining of work-related stress and a respiratory infection. (Pl.'s Resp. to Def.'s 56.1 ¶ 26.) On December 6, when Watson reported to work for only two hours, Michalowski directed Watson to provide medical documentation by Friday, December 9, warning that he would otherwise be considered absent without leave ("AWOL") and

---

[1] Regrettably, the record does not reveal what exactly the substance was.

4

not receive pay. (*Id.*) At 7:30 a.m. on December 9, Watson was marked AWOL. (Pl.'s 56.1 ¶ 59.) Later that day, around 3 p.m., Plaintiff did fax the documentation to Michalowski, but for some reason, Michalowski did not see it immediately. (Def.'s 56.1 ¶ 27.) Michalowski noticed the error on December 12 and ordered that a salary adjustment form be prepared for Watson. (*Id.*) Watson received the corrected pay on December 16, his scheduled pay date. (*Id.*)

Also around this time, Watson submitted his leave requests for the weeks of Thanksgiving and Christmas of 2006. (Pl.'s 56.1 ¶ 62.) Christine Stine, manager of the Roselle branch, was in charge of creating and maintaining the leave schedule for managers in the Schaumburg facility and its branches. (Def.'s 56.1 ¶¶ 4, 28.) Employee leave requests were honored in order of seniority. (*Id.* ¶ 29.) Watson was listed third on the seniority list, calculated based on the amount of time the individual had held his/her office, and Plaintiff's leave request was denied because the two managers listed above him on the seniority list—Stine and John Perry—had also requested those two weeks. (*Id.* ¶ 29; Ex. W to Def.'s 56.1; Pl.'s 56.1 ¶ 62.) Watson disputes the manner in which seniority was calculated, and maintains that he was in fact the most senior manager because Judge Coar's order from September 2002 stated that he would have "retroactive seniority." *Watson*, 2002 WL 31006129, at *6.

In any event, after Plaintiff's short workday on December 6, he did not return to work for more than three weeks. On December 27, he appeared but worked just half an hour before leaving. (Def.'s 56.1 ¶ 31.) Plaintiff was away for more than one month before he next reported to work on either February 7 or 8, 2006, when he again worked only half an hour before leaving. (Pl.'s Resp. to Def.'s 56.1 ¶ 32.) One month later, on March 8, 2006, Plaintiff reported to work for the last time, again for half an hour. During that half hour, Michalowski asked Plaintiff whether he was representing a craft employee, Darrell Coburn, in an EEOC proceeding. (Def.'s 56.1 ¶ 33.) Previously, in August 2005, Michalowski had given Watson and the other managers a copy of a memorandum from the Senior Assistant Postmaster General that stated: "It is inappropriate for a

5

postal manager or supervisor to represent a bargaining unit employee in any administrative proceeding." (*Id.* ¶ 8.) Watson had in fact been representing Coburn prior to August, but denies that he continued to serve as Coburn's representative after receipt of the memorandum. (Pl.'s Resp. to Def.'s 56.1 ¶ 35.) He does admit that he served a summons in November 2005 on Coburn's behalf, but maintains that this does not rise to the level of representation. (*Id.*) USPS claims that five other documents from Coburn's investigative file listed Watson as Coburn's representative, though Defendant has not submitted any of these documents to the court. (*Id.*) Defendant also concedes that none of those five other documents contained Watson's signature, and that on several forms he signed in 2005 and 2006, Coburn stated that he was proceeding *pro se*. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 77-79.)

On March 31, 2006, Michalowski proposed that Watson be removed from USPS, citing two reasons: first, his failure to follow proper procedures in handling the powder incident of November 30; second, his failure to follow instructions by continuing to represent Coburn after August 2005. (Def.'s 56.1 ¶ 34.) Plaintiff's attendance was not listed as a reason for his termination. On May 25, 2006, Donald Nichols (who had replaced Bacon as Manager of Post Office Operations) agreed that Watson should be terminated, effective June 3, 2006. (*Id.* ¶¶ 2, 36.) Subsequently, Plaintiff filed three complaints of discrimination with the EEOC in September 2006, alleging that he was the subject of discrimination on the basis of his race and gender and that he was retaliated against based on his past EEOC complaints against USPS. (*Id.* ¶ 37.) The EEOC administrative law judge ("ALJ") found for USPS on all three claims. (*Id.*) Watson also appealed Nichols's decision to terminate him to the Merit Systems Protection Board ("MSPB"), raising retaliation and race discrimination claims. (*Id.* ¶ 38.) Following an evidentiary hearing in October 2006, the ALJ concluded that Nichols's charges against Watson were supported by the evidence and found no evidence that Watson had been subject to retaliation or race discrimination. (*Id.*) Watson's request for review was denied, and the MSPB entered its final order on February 23, 2007. (*Id.*)

Plaintiff filed this complaint shortly thereafter, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, among other claims.[2] Plaintiff is no stranger to federal litigation. In numerous cases, he has alleged that actions taken by USPS over the past two decades were the product of discrimination or retaliation. *See, e.g.*, *Watson v. Henderson*, No. 99 C 6260, 2000 WL 1230444 (N.D. Ill. Aug. 23, 2000) (granting summary judgment for defendant on Watson's claims of race discrimination and retaliation), *aff'd sub nom. Watson v. Potter*, 23 F. App'x 560 (7th Cir. 2001); *Watson v. Runyon*, No. 95 C 744, 2000 WL 680223 (N.D. Ill. May 22, 2000) (magistrate judge's recommendation that retaliation claim be dismissed), *aff'd*, No. 95 C 744 (N.D. Ill. Aug. 27, 2001), *aff'd*, 35 F. App'x 261 (7th Cir. 2002); *Watson v. Runyon*, No. 96 C 6921, 1997 WL 261324 (N.D. Ill. May 8, 1997) (dismissing Watson's race discrimination, sex discrimination, and retaliation claims); *see also Watson v. Potter*, No. 03 C 4023 (N.D. Ill. May 15, 2007) (judgment for defendant following a bench trial); *Watson v. Henderson*, No. 00 C 402 (N.D. Ill. Sept. 28, 2001) (complaint dismissed); *Watson v. Henderson*, 99 C 1196 (N.D. Ill. May 26, 1999) (same); *Watson v. Runyon*, No. 96 C 6305 (N.D. Ill. Dec. 20, 1996) (same).[3] In the case now before the court, Defendant previously filed a motion to dismiss, which was granted in part, so only Watson's claims of race discrimination and retaliation remain.

## **DISCUSSION**

Both parties have moved for summary judgment. Summary judgment is appropriate when

---

[2] In his briefs, though not in the complaint, Plaintiff presented a short argument that he was also subjected to discrimination on the basis of gender. While courts "liberally construe" *pro se* plaintiffs' complaints, *Castillo v. Cook County Mail Room Dep't*, 990 F.2d 304, 307 (7th Cir. 1993), that principle does not allow a plaintiff to argue that defendant is liable on a theory not even alluded to in the complaint. Plaintiff here filed a complaint and an amended complaint and did not include a gender discrimination claim in either one. Defendant could not have fairly been on notice of a gender discrimination charge, the record appears to offer little support for one, and the court will not consider such a claim.

[3] This list may not be exhaustive of federal lawsuits, and does not include administrative claims Watson has filed.

"the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering cross-motions for summary judgment, the court draws inferences "in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). Likewise, the evidence presented is considered in the light most favorable to the nonmoving party. *Id.* at 499-500.

The methods of proof for discrimination claims and retaliation claims are similar: in both instances, a plaintiff may proceed under either the direct or indirect method. To prove retaliation under the direct method, a plaintiff must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection between the two. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008). A plaintiff may proceed under the direct method to prove discrimination either by presenting direct evidence of discrimination—such as an admission by the employer that he intentionally discriminated against the plaintiff—or circumstantial evidence of discrimination—including suspicious timing, evidence of disparate treatment of similarly situated employees, and "other bits and pieces from which an inference of discriminatory intent may be drawn." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 861-62 (7th Cir. 2007) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1997)). Plaintiff lacks both evidence of a causal connection and direct evidence of a discriminatory animus; accordingly, although his briefs do not clearly specify under which theory he is proceeding, the court assumes that he means to proceed under the indirect method.

The indirect method of proving either racial discrimination or retaliation requires a plaintiff to make a *prima facie* showing that (1) he is a member of a protected class; (2) he was performing to his employer's legitimate expectations; (3) he suffered an adverse employment action; (4) similarly situated employees who were not part of that class were treated more favorably. *Andonissamy*, 547 F.3d at 849-50. If the plaintiff can establish the *prima facie* case, the employer

must articulate a legitimate reason for the employment action; if the employer does so, the plaintiff must prove that the reason is pretextual. *Matthews v. Wisc. Energy Corp. Inc.*, 534 F.3d 547, 558 (7th Cir. 2008). The parties have identified seven events contained in Plaintiff's complaint that Plaintiff cites as examples of either discrimination or retaliation[4]: the letters of warning, Plaintiff's merit rating evaluation, denial of Plaintiff's Thanksgiving and Christmas 2006 leave request, the AWOL incident in December 2005, changing the amount of hours Plaintiff worked, relieving Plaintiff of his managerial duties, and Plaintiff's termination. The first four of these claims fail for the same reason,[5] namely, that none allege an adverse employment action actionable under Title VII. "Showing an 'adverse employment action' is a necessary condition under either the direct or indirect methods" of proving discrimination and retaliation. *Id.* at 559. Although the standard for what constitutes an "adverse employment action" differs in retaliation as opposed to discrimination claims, the first four actions of which Plaintiff complains fail under either. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII's substantive provision and its anti-retaliation provision are not coterminous.").

To qualify as an "adverse employment action" in a race discrimination case, the action must

---

[4] Plaintiff has not clearly alleged which events he attributes to which theory (race discrimination or retaliation), and so the court considers whether either theory creates a genuine issue for each of the events.
    The court further notes that Plaintiff's frequent activity with EEOC and the courts makes it difficult to know precisely which complaint(s) he cites as the basis for the retaliation charge. Based on Plaintiff's discussion in his briefs, the court assumes that the 2002 decision of Judge Coar constitutes the activity that generated retaliation against Plaintiff. Plaintiff does make passing reference to other EEOC activity he engaged in subsequent to Judge Coar's decision, though, and, extending a good deal of license to Watson as a *pro se* plaintiff, *Castillo*, 990 F.2d at 307, the court does not consider whether the amount of time between Coar's ruling and the 2005 actions at issue here tends to undercut proof of retaliation. *See George v. Walker*, 535 F.3d 535, 539 (7th Cir. 2008) ("The inference that protected speech was the motive for an adverse employment decision weakens as the time between the protected expression and the adverse action increases . . . .").

[5] Several of these allegations may also be deficient in other ways which the court need not explore here.

be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). The first four claims identified above do not meet this standard. The letters of warning were just that: *warnings* that avoided actual adverse action. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (USPS letter of warning "is generally considered insufficient to qualify as an adverse employment action"). Receiving a poor evaluation also is not a "significant change in employment status," especially in this case, where the low evaluation was prepared by Watson himself and only approved by Michalowski. *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008) ("negative performance evaluations, standing alone, are not cognizable adverse employment actions"). Next, denial of Plaintiff's leave request is also not akin to hiring, firing, or significantly changing responsibilities or benefits, nor does it amount to a significant change in status. *See MacKenzie v. Potter*, 219 F. App'x 500, 503 (7th Cir. 2007) (even several denials of postal worker's leave requests were merely "inconvenient" and not an adverse action); *Allen v. Potter*, 115 F. App'x 854, 861 (7th Cir. 2004) (same). Finally, the incident where Plaintiff was incorrectly marked AWOL, but received a salary adjustment within one week of the mistake is also too insignificant to allow for recovery under Title VII because Plaintiff received the pay to which he was entitled on his regularly scheduled pay day. Therefore, these four complaints of Plaintiff, as inconvenient as they might have been, do not afford a basis of relief for discrimination under Title VII.

Retaliation claims embrace a somewhat broader definition of "adverse employment actions," but Plaintiff's first four issues still fall short. A retaliatory employment action is sufficiently adverse if it would be likely to discourage a reasonable person from exercising his rights under Title VII. *White*, 548 U.S. at 68. Two of these actions are clearly so insignificant that they do not constitute adverse employment actions. First, Defendant's endorsement of Plaintiff's *self*-evaluation will not

dissuade future complainants from bringing EEOC charges and does not support a retaliation claim. *See Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (even when administered by a supervisor, "lower performance ratings are not actionable unless they are accompanied by tangible job consequences"). Similarly, Plaintiff's complaint regarding his pay, which he ultimately received on the scheduled pay date, strikes the court as a "trivial" rather than "significant" harm and is therefore not actionable under the anti-retaliation provisions of Title VII. *Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008) (citing *White*, 548 U.S. at 68).

The two remaining complaints—regarding the warnings and the denial of Plaintiff's leave request—are somewhat closer. In some circumstances, warnings may be considered adverse actions. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007). "This is a context-driven inquiry," *id.*, however, and in this context, the letters of warning were not retaliatory because they were issued in lieu of suspensions that USPS could have administered for Watson's failure to follow instructions. Nothing about these letters themselves would deter an employee from bringing an EEOC complaint in the future, particularly as they appear to be more lenient than other possible actions USPS could have justifiably taken against Plaintiff. Finally, the denial of Plaintiff's leave request was not a materially adverse action because USPS followed an objective, neutral means of determining seniority and leave requests. Although Plaintiff argues that Defendant should have determined seniority differently, the court simply cannot conclude that the seemingly objective denial of what are presumably the two most popular weeks requested for leave is so serious that it would dissuade an employee from filing EEOC charges. Even if these two actions did constitute adverse employment actions, Plaintiff has offered no evidence that shows USPS's offered reasons were pretextual or improperly motivated; on the contrary, USPS appears to have had ample reason to take the actions listed. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 734 (7th Cir. 2001). None of these four events can thus support a cause of action for retaliation.

Before considering the three remaining allegations in Plaintiff's complaint, which arguably

present instances of materially adverse employment actions, the court briefly considers the possibility that the cumulative effect of all these events constituted an adverse employment action. The Seventh Circuit has recognized that Title VII supports liability for cases where "the *conditions* in which [a plaintiff] works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). This category of Title VII cases includes instances where the employee's desk is moved to a closet; cases of constructive discharge where the employer has made the employee's job unbearable; and instances where harassment or mistreatment rises to the level that an objective observer would consider them "sufficiently severe to worsen substantially his conditions of employment." *Id.* at 745.

The court can safely say that the totality of circumstances identified by Plaintiff do not rise to this level. As a manager, Plaintiff repeatedly disobeyed a wide variety of Michalowski's orders and was only removed from his managerial duties after putting the safety of his employees at risk. Even then, Michalowski was willing to allow him to work at the Schaumburg facility by completing a tutorial program and conducting a route inspection, work that Plaintiff never performed due to his frequent absences. (Def.'s 56.1 ¶ 26.) This work may have been less prestigious than Plaintiff's work as branch manager, but it was not so humiliating as to give rise to Title VII liability. The court thus concludes that the cumulative effect of these otherwise unactionable claims does not create a genuine issue that Defendant retaliated or discriminated against Plaintiff. The court now turns to consideration of Plaintiff's three remaining claims.

**A.      Excessive Hours**

Plaintiff alleges that he was regularly required to work more than eight hours per day without additional compensation while his peer managers were not similarly burdened. (Compl. ¶ 13.) Defendant agrees that on January 13, 2005, Watson and other managers were instructed to stay

12

in their offices until the last letter carrier arrived, which would likely entail working longer than eight hours. (Def.'s 56.1 ¶ 15.) Put simply, the court sees nothing discriminatory or retaliatory about this requirement. As a Level 21 employee, Watson was exempt from FLSA hourly requirements. (ELM at 158, Ex. E to Def.'s 56.1 ("career employees who are exempt from the FLSA provisions [] are not limited to working a specified number of hours in a service week").) Nor has Plaintiff presented any credible evidence that he was singled out to work longer hours without additional pay. Plaintiff states that he was the only manager disciplined for working less than an eight-hour day; he provides no support for this assertion, however, nor does he provide any evidence that other managers left work early but were not disciplined.[6] Plaintiff argues that John Perry, a Level 17 employee who was not FLSA-exempt, was detailed to higher level work that should not have merited overtime pay but that Perry still received overtime pay. (Pl.'s Resp. to Def.'s 56.1 ¶ 6.) Perry is not similarly situated to Plaintiff. In any event, Plaintiff simply misunderstands the applicable postal regulations: the Employee and Labor Relations Manual clearly states that for employees who are usually nonexempt from the FLSA but are detailed to another position that would be exempt, "regardless of the time temporarily spent performing exempt work, the employee remains eligible for overtime and premiums as applicable to nonexempt positions." (ELM at 173, Ex. E to Def.'s 56.1.) Plaintiff has not demonstrated the existence of a genuine issue that the additional hours requirement was in any way discriminatory or retaliatory.

**B.     Managerial Duties**

Michalowski stripped Watson of his managerial duties immediately after confirming that Watson, in flagrant disregard of USPS policy, had endangered his employees by instructing them

---

[6] Plaintiff claims that Tim Adam, manager at the Schaumburg facility, testified that he was not required to stay until the last carrier returned every day. Adam did indeed say that, but he immediately explained that because the postmaster also worked at his office, "there were two managers" at that facility, only one of whom needed to stay until the last carrier returned. (EEOC Tr. 64:1-19, Ex. 45A to Pl.'s 56.1.)

13

to mishandle a mysterious powdery substance. Defendant is entitled to summary judgment on Plaintiff's claim that this violated his civil rights because Watson was not meeting his employer's legitimate expectations. *Andonissamy*, 547 F.3d at 849-50. Watson's instructions to his employees—to scoop up the mysterious substance and moisten it—put his employees in danger and could have led to disastrous results. Plaintiff's poor judgment on that matter seems obvious to a casual observer, but should have especially been apparent to Plaintiff himself, who had received training on how to handle such substances. (EEOC Tr. 236:4-237:4, Ex. C to Def.'s 56.1.) Watson complained in his brief that neither the acting supervisor[7] nor the employees themselves were disciplined for their participation; Plaintiff provides no support for this assertion, but even if he did, Defendant's decision to hold the branch manager responsible for such a breach of employee safety is patently reasonable. Indeed, one can imagine the potential liability Defendant would be facing if Watson remained the supervisor and an employee were injured by a similar failure on Watson's part. Removing him from a position where he could again place his employees at risk was an altogether appropriate response by Defendant to Plaintiff's actions.

**C.     Termination**

Finally, Plaintiff maintains that his termination was the result of discrimination and/or retaliation. The MSPB previously assessed the propriety of Plaintiff's termination and whether it was the result of retaliation or race discrimination, ultimately concluding that it was not. (Def.'s 56.1 ¶ 38.) Defendant asserts that this is a "mixed" case, in which Plaintiff is both appealing the MSPB's decision affirming Plaintiff's termination and pursuing his discrimination claims. *See* 5 U.S.C. § 7703. As the court reads his briefs, however, Plaintiff's complaint makes only discrimination and retaliation arguments and does not seek review of the MSPB's determination of the propriety of Defendant's termination decision. The court therefore has no reason to consider the standard of

---

[7]     Although not clear from Plaintiff's submissions, "acting supervisor" may refer to whomever was on duty and in charge at 3 a.m. when the substance was discovered.

review to be given to claims asking for review of an MSPB decision and considers *de novo* Plaintiff's claim that his termination was the result of discrimination or retaliation. *Mirza v. Dep't of Treasury*, 875 F. Supp. 513, 521 (N.D. Ill. 1995) (when hearing a case that was previously before MSPB, "a federal district court reviews the discrimination claim *de novo*").

Michalowski offered two reasons for Watson's removal: first, Watson's failure to follow proper procedures when handling the powder incident; second, his failure to follow Michalowski's August 2005 instruction not to represent a craft employee in a proceeding against USPS. Plaintiff does not appear to dispute that either of these two reasons would support his termination; rather, Plaintiff appears to argue that these were merely pretexts for Defendant's discriminatory motives. The court determines that a genuine issue of fact exists concerning whether Plaintiff did represent Coburn in violation of Michalowski's instructions; Plaintiff steadfastly denies that he served as Coburn's representative, and the only documentary evidence Defendant has offered in support of its contrary assertion is Plaintiff's signature on a summons. Still, regardless of whether Plaintiff did in fact represent Coburn, Plaintiff has not seriously called into question that Michalowski reasonably believed that Plaintiff did represent him. The MSPB previously considered whether Plaintiff's termination was supported by the evidence; this court is only considering whether Plaintiff was fired out of a *motivation* of retaliation or discrimination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005))).

Plaintiff's argument further fails because his failure to follow the proper procedure in handling the powder provides an independent basis for his dismissal and he cannot make a *prima facie* case that his termination was motivated by an ill intent. Specifically, he has not shown the existence of a genuine issue of material fact that he was meeting his employer's legitimate

15

expectations or that a similarly-situated employee was treated more favorably. He cannot show that he met his employer's legitimate expectations in the manner in which he dealt with the powder incident, as his mishandling of that incident could have put people's lives in danger. Nor has he identified any other high-level managers who failed to follow the appropriate procedure but received less serious discipline. Plaintiff has not challenged that his failure to follow proper procedure alone gives cause for his termination, and this failure defeats Plaintiff's claim that his termination was motivated by an improper animus.

The fact that Plaintiff was fired approximately four months after the powder incident might be a basis for suspicion in some circumstances, but not here. After Michalowski learned of the powder incident and reassigned Plaintiff, Watson showed up for work only a handful of times, never for a longer period of time than a couple hours. Indeed, the drastic change in Plaintiff's attendance occurred the day after his reassignment; if Defendant had intended to take other disciplinary measures short of termination, it could not have done so because Plaintiff was never at work. Curiously, USPS did not list the stunning attendance lapse as one of its reasons for Plaintiff's termination, and neither party explains the omission of this obvious ground for Plaintiff's termination. The court is puzzled by this omission, as there is no indication that the extended absence was a legitimate use of accrued leave time or otherwise permitted. In any event, Plaintiff has failed to establish a *prima facie* case under the indirect method and has also failed, under the direct method, to produce evidence creating a genuine issue of material fact as to whether a discriminatory or retaliatory motive animated Defendant's decision to terminate him. Summary judgment must therefore be granted in favor of Defendant.

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment [40] is granted and Plaintiff's Motion for Summary Judgment [50] is denied.

                      ENTER:

Dated: February 19, 2009

                      REBECCA R. PALLMEYER
                      United States District Judge